## F. J. HACKER v. STATE.

No. A-9870.  Oct. 22, 1941.
(118 P. 2d 408.)

120

Meacham, Meacham & Meacham, of Clinton, and Riley Q. Hunt, of Grove, for plaintiff, in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, F. J. Hacker, was charged in the district court of Delaware county, Oklahoma, by information on July 22, 1939, with the crime of rape in the first degree, was tried, convicted and sentenced to serve 15 years in the State Penitentiary, from which judgment and sentence he appeals to this court.

Defendant was a minister of the Church of the Kingdom. It is alleged that he had sexual intercourse in July, 1938, with one Edna George, "a female person of unsound mind and incapable through lunacy and such condition of mind of giving her consent to said act or realizing the nature and consequence thereof, and not the wife of him."

The only question raised by counsel for defendant that it is necessary for us to consider is whether or not there was sufficient evidence to prove that the prosecutrix was, through lunacy or any other unsoundness of mind, incapable of giving legal consent to an act of sexual intercourse.

Dr. C. F. Walker testified for the state that prosecutrix was "what we classify as a moron by an intelligence test, and I would say she had the mind of a child of about ten years old." The witness would not undertake to state whether or not prosecutrix would know the nature and probable consequences of an act of sexual intercourse.

Bill George, father of the prosecutrix, stated that she couldn't remember things, wasn't much of a hand to write,

and talked to herself; that she could read, and sometimes went out by herself. That he noticed a change in her about two years before the trial, when she started attending a meeting where the defendant was preaching.

Edna George, the prosecuting witness, testified that she was 26 years old. She had been to school a part of the time until she was 15, and had reached the fourth grade. She could read, write, count, and make change. At 15 she was forced to quit school because of the illness of her mother, and since that time she had done the housework and cooked for her family of nine people.

Prosecuting witness and her family were members of defendant's congregation. Church services were held daily. The first time the preacher asked her to come to the church in the morning so that he could pray for her was "about June." She went to the church. Defendant locked the doors and had intercourse with her. After that they had intercourse in the church two or three times, at intervals of about two weeks apart. Defendant told her that the intercourse "wouldn't be no harm." Prosecutrix had a nine months old baby at the time of the trial.

The testimony of Edna George was lengthy. A large part of her examination was by the court. A portion of her testimony is as follows:

"Q. Do you know the nature and obligations of an oath, that is, do you know what it means if you don't tell the truth here to-day? A. Yes, I do. Q. What? A Don't tell the truth, go to hell. Q. You know the difference between right and wrong? A. Yes, I certainly do. * * * Q. You know how the act of sexual intercourse is accomplished? A. Yes, sir. Q. You know as a consequence of such an act of intercourse that babies are born as a result of that? A. Yes, sir. Q. You knew that at the time you went up there? A. Yes, sir. Q. You went up there of your own free will and accord; nobody forced

you to go up there? A. He asked—. Q. Brother Hacker asked you to? A. Yes. Q. How far did you say you went in school? A. The fourth grade. Q. You were 15 when you quit? A. Yes. Q. Do you remember any of the teachers you had? A. Yes. Q. Tell the jury the names of some of them? A. Well, Maxine Hampton, Miss Dorothy Hicks, and Ray Warner. * * * Q. How long after you quit going up to the church to meet Brother Hacker to have sexual intercourse with him that you told your folks that you had gone up there and had sexual intercourse with him? A. I never told nobody. Q. You never did tell your folks you had gone up there and had sexual intercourse with him? A. No, sir. Q. Never have told anybody? A. Oh, I told the folks afterwards. Q. How long afterwards was it you told them? A. Three months. Q. How long, if you remember now, since you went up to the church? A. It has been—it will be two years in June. Q. Since you went up to the church? A. It will be two years then. Q. At home you do the housework, do you not? A. Yes. Q. And the cooking? A. Yes, sir. Q. And do the chores? A. No, I don't do the chores. I do the housework. Q. You go to town by yourself? A. No, I haven't lately, but I used to, just once in awhile. Q. You buy things at the stores? A. Yes, sir. Q. Went to the fourth grade in school? A. Yes sir. Q. Knew the nature and possible consequences of the act of sexual intercourse, at the time you went up to the church? A. Yes, sir. * * * Q. You know what a birth certificate is? A. Yes. Q. In filling that out did you give the father's name on that birth certificate? A. Yes. * * * By the Court: Q. How old were you when you started to go to school? A. Oh, about seven. Q. And went until you were 15? A. Yes. Q. Did you go every year? A. We—I wouldn't go often enough to make my grades every year; always missed and helped work. * * * Q. How old were you when you first found that out and knew what it was (sexual intercourse)? A. Oh, 12 or 13 years old. * * * Q. Why did you have intercourse with this man? Just tell me that the best you can, why you did, and the reasons for it, if you understand what I mean? A. Because he say wasn't no harm. Q. Did you believe

that? (No answer). Q. Did you believe it wasn't any harm? A. No, I didn't believe it. Q. Why did you do it? (No answer). Q. I just wanted you to tell me the best you can at the time? A. I felt it wasn't right. Q. You thought it wasn't right then? A. Yes, sir. * * * Q. How many chickens on the place? A. About 50. Q. What kind of chickens are they? A. Oh, just Buff Orphingtons. Q. What kind of chickens you like the best? A. I like Buff Orphingtons, best. Q. Why? A. Because they look like they are the prettiest. Q. Which ones lay the most eggs, you think? A. I think they do. Q. You ever raise any other kind of chickens? A. Yes, we just raised mixed chickens. Q. Got any hogs? A. The folks have got them. Q. What kind are they? A. These red ones. * * * Q. How long have you lived there by Grove? A. Well, we have lived where we are at a year—about two years; this is the third year. Q. Who owns the place? A. Well, Bert Slocum used to own it, but I don't know the man now; he lives in Texas. Q. You rent it? A. Yes. Q. How much rent do you pay? A. We give him half of the grapes and a third of the rest. * * * Q. How long after you had intercourse with this man until your baby was born? A. Nine. Q. Is that how long it takes to have a baby? A. Yes. Q. How long have you known that? A. I have known it a long time. Q. Ever since you was a little girl 12 or 13 years old? A. Yes. Q. Did you know if you had intercourse with a grown man that you was liable to have a baby? A. I knowed it. Q. How long you known that? A. A long time. * * * Q. Well, did you say anything to him about you might have a baby if you had intercourse with him? A. No, sir. Q. But at the time you did it you mean you was afraid to? A. Yes. Q. What did he say? A. Didn't say nothing. Q. Did you tell him why you was afraid to? A. Yes. Q. He didn't say anything? A. No, sir. * * * Q. But you do know a man can be sent to the penitentiary for doing that? A. I think so. Q. What kind of a place is the penitentiary? A. Well, I never did see it. Q. What is one for? A. For people to stay in— mean people. Q. People that do something and are sent down there? A. Yes. Q. Are they turned loose down

there? A. Kept in a jail house. Q. What do they have to do? A. Some of them have to work. I have never been around one—just heard, hearsay. * * * Q. Who was the first person you told about this? A. I told my sister. Q. How many days are there in a month? A. Well, some 31, some of them 30. Q. Is any of them less than 30? A. One, 28. Q. You know that little rhyme, that little verse, about the days in the month, about 'Thirty days hath September, April, June and November'? A. I heard it. Q. Can you repeat that? A. I never did look at the month. Q. What month of the year has less than 30 days? A. February. Q. How many days does it have? A. Twenty-eight sometimes. Q. How many days in a year? A. 365. Q. What state is this we are living in? A. Oklahoma. * * * Q. Have you known any other girls that had babies that wasn't married? A. Yes sir, I do. Q. Did you know them before you got into this trouble with this man? A. Yes. Q. Who were some of them? A. Well, Martha Ann Melton. She used to be a Melton. Q. Did you go to see her? A. No. Q. Did you go to see her before she had the baby? A. No, sir, I saw her in town. Q. What did people say about her; did they talk about her in any way? A. Yes, sir. Q. What did they have to say about her? A. Oh, they just laughed about it. Q. Did you understand the people would laugh at you like that if you had a baby? A. Well, I didn't go nowheres. Q. Did you care what people said about you? A. Well, I didn't go where they did. Q. I know, but did you care what people said about you? A. Yes, sir, I did. Q. Now, after you had intercourse with this man, were you worried; did you think you might get something wrong with you, and have a baby? A. Yes. * * * Q. Which would be the worst, to have intercourse with a married man or single man? A. With a married man. * * * Q. What day of the year is Christmas on? A. 25th of December. Q. Suppose you would buy 65 cents worth of groceries from the clerk and you would give him a dollar; how much change would you get? A. I would get 35 cents. * * * Q. You say you know at this time it is wrong to have intercourse with a man? A. Yes. Q. At the time you first had intercourse with Hacker, he told

you there wasn't any harm in it, and wanted to pray for you, and took you up and laid you down on this quilt, did you think it was wrong then? A. Yes. * * * Q. Did you think that every time you had intercourse with a man you had a baby, or what did you think? A. I don't think it happens every time."

This action was brought under section 2515, O. S. 1931, 21 Okla.St.Ann. § 1111, which provides:

"Rape is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator * * * where she is incapable through lunacy or any other unsoundness of mind, whether temporary or permanent, of giving legal consent." ·

Section 2518, O.S.1931, 21 Okla.St.Ann. § 1114, states:

"Rape committed by a male over 18 years of age upon a female under the age of fourteen years, or incapable through lunacy or unsoundness of mind of giving legal consent * * * is rape in the first degree."

This court said in Adams v. State, 5 Okla. Cr. 347, 114 P. 347, 350, that:

"Legal consent presupposes an intelligence capable of understanding the act, its nature, and possible consequences. This degree of intelligence may exist with an impaired and feeble intellect, or it may not."

The only circumstance offered by the state to show that prosecutrix was incapable of giving legal consent by reason of lunacy or unsoundness of mind is that she was considered to have the mentality of a child of ten or twelve. No opinion, either lay or expert, was expressed that she was incapable of legal consent, and no basis for such opinion was laid, with the exception of her low mental age.

The trial court, in discussing the demurrer of the defendant to the evidence of the state, expressed his views concerning the law relating to this proposition as follows:

"It seems that the Legislature has declared a public policy in this state by saying that intercourse with a female under the age of 14 years, is rape in the first degree, and therefore such female is incapable of giving consent, in that she didn't know the nature and consequences of sexual intercourse, which is a conclusive presumption of the statute. Therefore, in construing the words 'legal consent', in this particular lunacy or incompetency section of the statute, this court is of the opinion that such female who is alleged to be a lunatic, or of unsoundness of mind, should in some degree be compared with the average girl of 14 years of age, or less."

It is apparent that the trial court thought the fixing of the mental age of the prosecutrix at less than 14 years was sufficient evidence to justify submitting this issue to the jury.

We cannot agree with this construction of the statute. It is probable that the Legislature, in fixing the age of 14 as the dividing line, had in mind not only the mental age of girls, but also their physical development. However, here we have a 26-year-old woman, fully developed and normal in all respects physically. If she has any crippled limbs or other parts of the body such as are frequently found in cases of this character, no mention of the same was made in the evidence.

Following the holding of this court that the degree of intelligence necessary to give legal consent may exist with an impaired and feeble intellect, or it may not, it is necessary for the state to show more than mental age, which was not done in this case.

The appearance and demeanor of the woman alleged to have been ravished, her general intelligence as indicated by her answers to the questions by the county attorney, counsel for defense, and the court, are important matters entitled to consideration in determining whether she

lacked sufficient mental capacity to give legal consent to the act of sexual intercourse.

Prosecuting witness' examination in regard to her capability to give consent, as measured by the rule set out in Adams v. State, supra, showed that she had a thorough understanding of the sexual act at the time of its consummation, its nature and possible consequences, even to the point of knowing that it was less wrong to cohabit with a single man than a married man.

In many jurisdictions, including this one, it has been held that whether the female possesses mental capacity sufficient to give legal consent must, save in exceptional cases, remain a question of fact for the jury. Adams v. State, supra; Lee v. State, 43 Tex.Cr.R. 285, 64 S.W. 1047; Williams v. State, 125 Tex.Cr.R. 477, 69 S.W.2d 418; People v. Griffin, 117 Cal. 583, 49 P. 711, 59 Am.St.Rep. 216; State v. Simes, 12 Idaho, 310, 85 P. 914, 9 Ann. Cas. 1216.

We have no occasion to say or suggest anything in mitigation of the conduct of the accused, if the story told by the young woman is true. His conduct, to say the least, is reprehensible. The crime for which the state elected to prosecute him requires that the mental incapacity of the woman to give consent be established beyond a reasonable doubt. Lacking this, his conviction cannot be upheld.

The judgment of the district court of Delaware county is reversed, with instructions to dismiss.

It is so ordered.

BAREFOOT, P. J., and DOYLE, J., concur.